## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Crim. No. 08-048 (RCL)** |
| | ) | |
| **JOSUE CUESTA LEON,** | ) | |
| a/k/a "Don Julio," a/k/a "Josue," | ) | |
| a/k/a "El Viejo," a/k/a "El Gordo," | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JOSE FERNANDO ROMERO MEJIA,** | ) | |
| a/k/a "Morocho," a/k/a "Alex," | ) | |
| and a/k/a "La Negra," | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | / | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT

**COMES NOW** the United States of America, by and through the undersigned attorneys, in response to the Defendants' Motion to Dismiss Indictment. Specifically, the defendants contend: (1) the indictment is insufficient and must be dismissed because it fails to include a material element of the offense, specifically the jurisdictional basis to establish the court's subject matter jurisdiction, and it fails to provide the defendants with adequate notice to prepare a defense; (2) the indictment is defective and must be dismissed because it violates the defendants' due process rights under the Fifth Amendment; and (3) 21 U.S.C. § 960a is unconstitutional. The defendants' motion must be denied for the following reasons: (1) while the original indictment was sufficient, the government has obtained a superseding indictment setting forth three separate jurisdictional bases for the instant criminal offense and alleging the specific

pecuniary value provided by the defendants to two separate designated Foreign Terrorist

Organizations, thereby rendering the defendants' arguments moot; (2) the indictment does not

violate the defendants' due process rights because the "protective" principle confers

extraterritorial jurisdiction over the defendants; and (3) the defendants' contention that 21 U.S.C.

§ 960a is unconstitutional is without merit because the statute is not impermissibly vague, and

Congress acted within its authority in enacting this legislation to criminalize narco-terrorism.

**I.     Defendants Arguments Are Rendered Moot By the Superseding Indictment**

The defendants argue that the indictment is defective because it fails to allege all of the

elements of the offense or state an offense against the United States.  Defs. P. & A. at 2-8.

Specifically, the defendants contend that the indictment must be dismissed because it fails to set

forth a jurisdictional basis to confer subject-matter jurisdiction.  *Id*. at 2-5.  Additionally,

defendants allege that the indictment is defective because it fails to adequately notify the

defendants of their criminal conduct.  *Id*. at 5-8.

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain,

concise, and definite written statement of the essential facts constituting the offense charged."

Generally, an indictment is sufficient so long as it sets forth the material elements of the offense

charged.  *See United States v. McBride*, 498 F.2d 683, 684 (D.C. Cir. 1974).  In most

circumstances, an indictment is sufficient and meets constitutional muster where it contains a

recitation of the statutory language along with sufficient facts to provide adequate notice to the

defendant.  *See United States v. Cisneros*, 26 F. Supp. 2d 24, 49 (D.D.C. 1998); *United States v.*

*Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) ("Ordinarily, it is proper for an indictment to be

drawn in the language of the statute.").  The government acknowledges, however, that an

indictment which tracks the statutory language "is not necessarily sufficient," *id.*, and "there are crimes that must be charged with greater specificity." *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007), *citing Hamling v. United States*, 418 U.S. 87, 118 (1974) and *Russell v. United States*, 369 U.S. 749, 764 (1962). To determine whether an indictment is sufficient, the Supreme Court has established a two-prong test:

> [F]irst, whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Russell*, 369 U.S. at 763-64 (1962) (internal quotations and citations omitted); *see Cisneros*, 26 F. Supp. 2d at 49 (same).

The original indictment met the two-prong standard and is sufficient. Nevertheless, the government has obtained a superseding indictment which clearly sets forth three separate jurisdictional bases for this offense and alleges the specific "anything of pecuniary value" which was knowingly and intentionally provided to two separate Foreign Terrorist Organizations, as designated by the United States Department of State. Accordingly, the defendants' arguments are now moot.

**a.      Although The Indictment Properly Contained All of the Material Elements of the Offense, the Defendants' Argument Is Rendered Moot By the Superseding Indictment**

First, the indictment is sufficient because it sets forth the basis for subject-matter jurisdiction under 21 U.S.C. § 960a(b). According to the plain language of the statute, there is no requirement that the jurisdictional element be set forth in the indictment, *cf.* Title 18, U.S.C. § 1001, and the defendants fail to cite any authority to the contrary. *See United States v. Pickett*,

353 F.3d 62, 67-68 (D.C. Cir. 2004) (indictment was insufficient because it failed to set forth the material elements of the offense in accordance with the plain language of the statute, Title 18, U.S.C. § 1001(c)).

In any event, three of the five jurisdictional elements are established in this case, and the government has obtained a superseding indictment which sets forth the jurisdictional bases in Paragraph Two of Count One.  *See* Exhibit A (Superseding Indictment).  First, Section 960a (b)(1) states that there is jurisdiction over a Section 960a offense if "the prohibited drug activity or terrorist offense is in violation of the criminal laws of the United States."  Providing material support to a designated Foreign Terrorist Organization ("FTO"), such as the *Fuerzas Armadas Revolucionarias de Colombia* (FARC) and the United Self-Defense Forces of Colombia (AUC), violates 18 U.S.C. § 2339B, and thus the prohibited drug activity at issue here is in violation of the criminal laws of the United States.  Second, Section 960a(b)(2) confers jurisdiction over this criminal offense if "the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce."  As described in more detail below, narco-terrorism affects interstate and foreign commerce.  Third, jurisdiction exists under Section 960a(b)(5) if "after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States."  Here, the defendants were brought into the United States, even though the conduct required for the offense occurred outside of the United States.  Accordingly, the defendants' argument that the indictment is insufficient for failure to set forth a jurisdictional basis is now moot.[1]

_____

[1]  Although a jurisdictional basis was not set forth in the original indictment, the defendants were made aware of the court's jurisdiction through the extradition materials, as well as each and every pleading filed by the government, to date, in this case (including the

The defendants also argue that the indictment is defective because it fails to allege a crime against the United States.  Defs. P. & A. at 3-5.  The defendants' exact contention has been rejected.  In *Lamar v. United States*, 240 U.S. 60 (1916), the Supreme Court rejected the appellant's claim that the court lacked jurisdiction because the indictment failed to charge a crime against the United States.  Justice Holmes concluded:

> And nothing can be clearer than that the district court, which has jurisdiction of all crimes cognizable under the authority of the United States, acts equally within its jurisdiction whether it decides a man to be guilty or innocent under the criminal law, and whether its decision is right or wrong. The objection that the indictment does not charge a crime against the United States goes only to the merits of the case.

*Id*. at 65.

Because the indictment charges the defendants with violating 21 U.S.C. § 960a, the defendants, in fact, are charged with a crime against the United States.  In any event, the superseding indictment, which alleges that the defendants provided money and/or weapons to designated FTOs, clearly sets forth a crime against the United States.  As such, the defendants' meritless contention is now moot.

**b.**    **While The Indictment Sufficiently Notified the Defendants of the Charges Against Them, Defendants' Argument is Without Merit in Light of the Superseding Indictment**

The defendants argue that the indictment is defective because it fails to provide notice of the charges against the defendants, specifically any facts to describe the terrorist activity or

---

government's motions to detain both defendants and toll the speedy trial clock).  *See* Exhibit B (pertinent portions of the extradition materials submitted in support of the United States' request for defendants' extradition from Colombia).  The superseding indictment merely incorporates those facts that were set forth in the extradition materials.  Thus, the defendants have not been prejudiced in any way.  *See Cisneros*, 26 F. Supp. 2d at 45-46 (courts typically uphold convictions despite challenges to the sufficiency of the charging papers so long as the defendant is not prejudiced and the indictment satisfies its fundamental functions).

terrorism, in support of the conduct charged in the indictment.  Defs. P. & A. at 7-8.  Because the

government has obtained a superseding indictment that specifically sets forth the facts in support

of the defendants' knowing and intentional provision of anything of pecuniary value to two

separate designated FTOs, the defendants' argument is now moot.[2]

    In returning a superseding indictment, the government does not concede that the original

indictment was insufficient in any way.  Indeed, the original indictment was sufficient because it

tracked the statutory language as well as set forth the time frame (2003 until November 12, 2007)

and location (Colombia, Venezuela, Suriname and other countries) of the alleged conspiracy to

distribute five kilograms or more of cocaine, knowing and intending to provide anything of

---

[2]  The government notes that the defendants have been apprized of the factual basis for
the charge set forth in the indictment since learning of the U.S. charges against them.  *See*
Exhibit B.  Specifically, the defendants were notified through extradition materials that the
evidence against them would include, *inter alia*, witness testimony, judicially authorized wiretap
intercepts, and evidence of cocaine seizures.  The defendants were informed that they allegedly
purchased coca base from the 1st and 16th Fronts of the FARC.  It was averred that said coca base
was purchased with cash and weapons from the sale of cocaine, and said coca base was
crystallized in laboratories in territory controlled by the AUC.  The defendants were notified that
the alleged conspiracy included the transportation of the crystalized cocaine by the Cuesta Leon
Drug Trafficking Organization via aircraft to Suriname, Guyana, and the Dominican Republic.
The defendants were further notified that the money earned from these cocaine sales was used to
purchase weapons, which were provided to the 1st and 16th Fronts of the FARC, as well as pay
taxes to the FARC and AUC for access to their respective territories.  In addition, all extradition
materials were provided to the defendants in both English and Spanish.  Thus, the defendants
were apprized of the charges against them and the factual basis for those allegations in their
native language.  "Thus, whatever the shortcomings of the indictment, it is clear from the record
that [the defendants were] on notice concerning the exact nature of the offense."  *McBride*, 498
F.2d at 686 (finding the indictment to which the appellant pleaded guilty sufficient).
    Moreover, the voluminous discovery provided in this case further thwarts the defendants'
argument that they were unclear of the charges against them or they were unable to adequately
prepare a defense.  *See id.*; *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("a court may
look to the record as a whole in determining whether the defendant is protected from double
jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity
to prepare his defense.").

pecuniary value to a person or organization that engages in terrorist activity and terrorism. *See Resendiz-Ponce*, 549 U.S. at 108 (finding the indictment sufficient where the indictment referenced the relevant criminal statute and provided "time-and-date information"); *United States v. Bourdet*, 477 F. Supp. 2d 164, 184 (D.D.C. 2007) (although"relatively spare," the indictment was "nonetheless sufficient to enable defendants to understand the charges against them and to prepare a defense" because it: identified a time period for the alleged conspiracy and at least three countries where the defendants acted in furtherance of the conspiracy; specified the object of the conspiracy; set forth the statutes violated by the conspiracy; and provided the mens rea required by those statutes); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ( "[A]n indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.").

In sum, while it is the government's contention that the original indictment was sufficient and adequately notified the defendants of the charges against them, the superseding indictment has cured any alleged defects, thereby rendering the defendants' arguments moot.

## II.     The Indictment Does Not Violate the Defendants' Right to Due Process Under the 5th Amendment

The defendants contend that, because the indictment fails to set forth one of the five jurisdictional principles of international law,[3] the indictment is fundamentally unfair given the

---

[3]  The five principles of extraterritorial jurisdiction are as follows:

[T]he 'objective territorial principle,' which provides for jurisdiction over conduct committed outside a State's borders that has, or is intended to have, a substantial effect within its territory; (2) the 'nationality principle,' which provides for jurisdiction over extraterritorial acts committed by a State's own citizen; (3) the 'protective principle,' which provides for jurisdiction over acts committed outside the State that harm the State's interests; (4) the 'passive personality principle,' which provides for jurisdiction

vague accusations of the defendants' threat against the United States.  The defendants' argument stems from the flawed premise that Congress can only legislate against criminal activity that occurs, at least in part, in the United States.  It is beyond dispute that Congress has the authority to criminalize a variety of extraterritorial conduct that can occur wholly overseas so long as its intent to do so is clear, *United States v. Bowman*, 260 U.S. 94, 98 (1922), and the statute is consistent with the Fifth Amendment's Due Process Clause, *Strassheim v. Daily*, 221 U.S. 280, 285 (1911).  Congress has exercised that authority in a wide variety of statutes.  *See, e.g.*, 18 U.S.C. § 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country); 18 U.S.C. § 1203 ("whoever inside or outside the United States, seizes or detains" a U.S. citizen); 21 U.S.C. § 959 (extraterritorial drug trafficking).

Indeed, a number of courts have held that it is not fundamentally unfair or otherwise a violation of due process to prosecute a defendant for extraterritorial conduct, such as drug trafficking on the high seas, which is "condemned universally by law-abiding nations." *United States v. Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002); *see, e.g., United States v. Suerte*, 291 F.3d 366, 375 (5th Cir. 2002) (not fundamentally unfair to apply extraterritorial drug trafficking statute to foreign defendant, especially where the foreign country consented to the application of the law); *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999) (same); *United States*

---

over acts that harm a State's citizens abroad; and (5) the 'universality principle,' which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations.

*United States v. Yousef*, 327 F.3d 56, 91, n.24 (2d. Cir. 2003); *see United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("International law permits extraterritorial jurisdiction under five theories: territorial, national, protective, universality, and passive personality.").

*v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (same).  Specifically, these courts have

found that the application of the Maritime Drug Law Enforcement Act ("MDLEA"), an

extraterritorial drug trafficking statute, does not violate due process because "Congress has

determined that all drug trafficking aboard vessels threatens our nation's security," and thus the

MDLEA statute "is consistent with the protective principle of international law."  *Cardales*, 168

F.3d at 553; *see United States v. Estupinan*, 453 F.3d 1336, 1338-39 (11th Cir. 2006) (drug

trafficking on the high seas is a serious international problem, is universally condemned, and

presents a specific threat to the security and societal well-being of the United States) (internal

citations and quotations omitted); *Martinez- Hidalgo*, 993 F.2d at 1056 (drug trafficking "is

condemned universally by law-abiding nations").  Such cases apply *a fortiori* to a prosecution for

extraterritorial drug trafficking where the narcotics proceeds (or anything else of pecuniary value

obtained through drug trafficking) is knowingly or intentionally provided to a terrorist or terrorist

organization.  In other words, the majority of circuits hold that there is no nexus requirement to

the United States for wholly extraterritorial criminal acts as long as there is sufficient notice to

the defendants, and consequently the application of the criminal statute is neither arbitrary nor

fundamentally unfair.  *See Suerte*, 291 F.3d at 375; *Perez-Oviedo*, 281 F.3d at 403 ("no nexus is

needed between a defendant's criminal conduct and the United States in order for there to be

jurisdiction."); *Cardales*, 168 F.3d at 552-53 (same); *Martinez-Hidalgo*, 993 F.2d at 1056

(same).  In fact, the law review article primarily cited by the defendants concludes that the notice

test is the proper due process standard, and "the nexus test would distort the purpose of due

process because the test would permit due process to become a tool by which defendants could

challenge Congress's power to legislate extraterritorially, rather than a right with which

defendants can protect themselves from government overreaching."  Lichter, Brian A., *The Offences Clause, Due Process, and the Extraterritorial Reach of Federal Criminal Law in Narco-Terrorism Prosecutions*, 103 Nw. U. L. Rev. 1929, 1947-48 (2009).

Yet, in this case, even the minority rule - that due process requires a sufficient United States nexus between the defendant and the federal crime with extraterritorial jurisdiction -  is satisfied.  *See Yousef,* 327 F.3d at 110; *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990).  In the case at bar, the prosecution of the defendants is consistent with the protective principle, which confers jurisdiction over "non-nationals for acts done abroad that affect the security of the State."  *Yousef,* 327 F.3d at 110; *See* Restatement (Third) of Foreign Relations Law § 402(3) (the "protective principle" of international law permits Congress to reach "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or . . . other state interests.").[4]  Again, the law review article primarily relied upon by the defendants reaches this exact conclusion.  *See* Lichter, Brian A., *supra* at 1943-44, 1949 (the protective jurisdiction is the appropriate legal basis to criminalize 21 U.S.C. § 960a).

Given Congress's intent in proposing the legislation at issue, the protective principle clearly applies here.  Simply put, the fact that drug trafficking is used to finance terrorism was the impetus for Congress's legislation; drugs trafficked to finance terrorism ultimately affects the

---

[4]  It should be noted, however, that this Circuit has held that a court has a "duty . . . to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."  *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991).  In other words, "the government is not required to prove that its prosecution of . . . [a defendant] comported with any of the customary international law bases of criminal jurisdiction."  *Yousef*, 327 F.3d at 110.  Consequently, *Yunis* supports the conclusion that this Circuit views the proper due process test to be that of notice rather than nexus.

security of U.S. citizens, as well as our allies.  Indeed, Representative Daniel E. Lungren

remarked during the floor debate:

> [T]he Hyde amendment recognizes a new reality in a very real danger that is growing: the
> deadly mix of drug trafficking and terrorism.  It has now been estimated that nearly half
> of the designated foreign terrorist organizations are involved in the trafficking of illegal
> drugs.  That is illegal drugs that end up on the streets of our cities, the cities of our allies,
> poisoning the fabric of their society and our society.  Terrorists . . . have recognized that
> illegally drug trafficking is a valuable source of financing and just another way to threaten
> our country. * * * Hezbollah has been linked to drug trafficking from South America to
> the Middle East; and of course the Revolutionary Armed Forces of Colombia has long-
> standing drug trafficking operations which fund their deadly activities.  The Hyde
> amendment simply creates a new Federal crime for the trafficking of controlled
> substances which are intended to benefit a foreign terrorist organization or any other
> terrorist organization.

151 Cong. Rec. H6293 (daily ed. July 21, 2005) (statement of Rep. Lungren).

Moreover, "the protective principle does not require that there be proof of an actual or

intended effect inside the United States." *United States v. Banjoko*, 590 F.3d 1278, 1281 (11th

Cir. 2009) (internal citation omitted).  At least two Circuits have found that "drug trafficking may

be prevented under the protective principle of jurisdiction, without any showing of an actual

effect on the United States" because "[p]rotective jurisdiction is proper if the activity threatens

the security or governmental functions of the United States." *United States v. Peterson*, 812 F.2d

486, 493-94 (9th Cir. 1987), *citing United States v. Pizzarusso*, 388 F.2d 8, 10-11 (2d Cir. 1968),

*cert. denied* and Restatement Second of Foreign Relations § 33.  In fact, in *Peterson*, the court

found that "[d]rug trafficking presents the sort of threat to our nation's ability to function that

merits application of the protective principle of jurisdiction."  *Id*. at 494.

Like drug trafficking, terrorism is a serious, international problem which presents a

specific threat to the security and societal well-being of the United States.  *See Holder v.*

*Humanitarian Law Project*, ___U.S. ___, 130 S. Ct. 2705, 2724 (June 21, 2010); *Estupinan*, 453

F.3d at 1338-39.  The designation of the FARC and the AUC as FTOs by the U.S. Department of

State is a clear statement that the U.S. Government views both organizations as a threat to its

national interests and security, thereby establishing jurisdiction under the protective principle.

*See* 62 Fed. Reg. 52,650, 52,651 (Oct. 8, 1997); 64 Fed. Reg. 55,112, 55,112-13 (Oct. 8, 1999);

66 Fed. Reg. 47,054 (Sept. 10, 2001); 66 Fed. Reg. 51,088, 51,089 (Oct. 5, 2001); 68 Fed. Reg.

53,420 (Sept. 10, 2003), 68 Fed. Reg. 56,860, 56,862 (Oct. 2, 2003).  The FARC has repeatedly

confirmed, through its actions and words, that they, indeed, represent a concrete threat to the

United States as a narco-terrorist organization and have repeatedly had an impact on the United

States.  It is beyond dispute that American nationals have been impacted by terrorist activities

committed in Colombia.  The FARC publicly acknowledged its detention of three American

hostages in Colombia from February 2003, until their widely publicized rescue in July 2008.  *See*

*United States v. Pineda*, Cr. No. 04-232, 2006 WL 825778, at *1 (D.D.C. Mar. 29, 2006)

(unpublished) (Hogan, J.) (observing that the "FARC . . . issued a public communique

acknowledging its detention of [three] Americans" who were kidnaped by the FARC).  The

American hostages were used as bargaining leverage to negotiate political concessions from the

Colombian government.  *See id.*  Indeed, in support of their motion, the defendants' rely on a law

review article that describes the FARC as "strongly Anti-American, characterizing American

citizens as military targets, and has engaged in violent acts against Americans in Colombia,"

Thomas, John, *Narco-Terrorism: Could the Legislative and Prosecutorial Responses Threaten*

*Our Civil Liberties*?, Wash. & Lee L. Rev. 1881, 1889 (2009) (internal citation and quotation

omitted).  Thus, "it cannot be argued seriously that the defendants' conduct was so unrelated to

American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 112; *see also United States v. Al Kassar*, 582 F. Supp. 2d 488, 494 (S.D.N.Y. 2008) (where defendants were indicted for, inter alia, conspiring to provide material support to the FARC, there was sufficient nexus to the United States for jurisdictional purposes because the defendants were charged with conspiring to sell weapons to the FARC in an effort to inflict injury on the United States and its people). Furthermore, providing material support, such as money and weapons, to a terrorist organization "unquestionably violates the laws of all civilized nations, which uniformly punish, prosecute and condemn terrorist violence." *Al Kassar*, 582 F. Supp. 2d at 495.

In sum, by trafficking in narcotics and providing material support to two separate FTOs, the defendants engaged in conduct that threatens the security of the United States, and thus falls within the "protective" theory of extraterritorial jurisdiction. The defendants have cited no cases in which a federal court has invalidated the extraterritorial application of U.S. law on due process grounds, *see United States v. Reumayr*, 530 F. Supp. 2d 1210, 1223 (D.N.M. 2008), and we are not aware of any such case. To dismiss the indictment based on this jurisdiction argument "would thwart Congress's express intent to create jurisdiction to combat crimes of this type." *United States v. Rashed*, 83 F.Supp.2d 96, 104 n.6 (D.D.C. 1999) (C.J., Lamberth).

For the aforementioned reasons, the Government submits that the defendants' due process rights have not been violated here, and the Court must deny the defendants' motion on this ground.

III.     **21 U.S.C. § 960a is Constitutional**

The defendants contend that Section 960a is unconstitutional because: (1) there is no nexus requirement between the drug activity and terrorist activity as intended by Congress, and as written, the statute allows prosecutions for terrorist activity that has happened in the past, thereby making the statute "unconstitutionally vague," *see* Defs. P. & A. at 12-15; and (2) Congress lacked authority to enact Section 960a. *See* Defs. P. & A. at 15-19.  Both arguments are without merit for the reasons below.

a.       **The statute is not impermissibly vague**

The defendants claim that the statute is impermissibly vague because 21 U.S.C. § 960a could feasibly apply to a hypothetical defendant whose drug activity had no "nexus" to his support of a an animal rights group that has allegedly engaged in terrorist activity, or to defendants who supported a terrorist organization that had engaged in terrorism in the past but no longer does so.  *See* Defs. P. & A. at 12-15.  However, the defendants do not claim that the statute is unconstitutionally vague as applied to the conduct alleged in this case; rather, their vagueness challenge is based on hypotheticals proposed in a law review article.  *See* Thomas, John, *supra* at 1911-15.

The Supreme Court has made it clear that courts must "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  *Humanitarian Law Project*, ___ U.S. ___, 130 S Ct. at 2718-19, *quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 (1982).  In *Humanitarian Law Project*, the Court held that the court of appeals erred in finding that the material support statute,

18 U.S.C. § 2339B, was unconstitutionally vague based on hypothetical circumstances, rather than the facts of the case before it.  *Id.*  Therefore, the defendants' claims must be rejected for the same reason, especially in light of the superseding indictment, which alleges that the defendants provided money from the sale of cocaine to the FARC and the AUC - both designated FTOs - as well as weapons, purchased with proceeds derived from the sale of cocaine, to the FARC.  *See* Exhibit A.

Finally, the defendants' claim that the law requires no connection between the drug activity and the terrorist activities is simply incorrect.  The statute punishes "whoever engages in [drug trafficking], or attempts or conspires to do so, knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity."  21 U.S.C. § 960a.  Thus, the plain language of the statute indicates that one must engage in drug trafficking while simultaneously knowing or intending to provide money - or other items of pecuniary value - to a person or organization that the defendant knows engages or has engaged in terrorism or terrorist activities.  "The plain language of a statute is strong evidence of Congress's intent," and a court must give legislation passed by Congress and signed by the President its "effect." *Port Auth. of New York & New Jersey v. Dept. of Transp.*, 479 F.3d 21, 31 (D.C. Cir. 2007); *see Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("The most reliable guide to congressional intent is the legislation the Congress enacted . . . .").  Accordingly, a court "must presume that Congress meant precisely what it said." *Nat'l Pub. Radio, Inc. v. F.C.C.*, 254 F.3d 226, 230 (D.C. Cir. 2001).  Indeed, "any argument that Congress did not mean . . . [what it says] runs into a powerful impediment, for the strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional

circumstances." *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 11 (2008) (internal citations and quotations omitted).  The D.C. Circuit expounded on this rarely rebutted presumption in *Nat'l Pub. Radio, Inc.*:

> Extremely strong, this presumption is rebuttable only in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters . . . [A defendant's] burden in rebutting the presumption created by clear language is onerous: [a defendant] must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.

*Nat'l Pub. Radio, Inc.*, 254 F.3d at 230 (internal citations and quotations omitted).

Here, the floor debate touched upon the connection between drug activity and terrorism, noting that "half of the formerly designated terrorist organizations have links to illicit narcotics," and specifically, the FARC and the AUC - both foreign terrorist organizations - "thrive on the drug trade, supporting and sustaining themselves with illicit proceeds."  151 Cong. Rec. H6292 (daily ed. July 21, 2005) (statement of Rep. Hyde).  The legislation was proposed because "[t]he link between narcotics and terrorism is growing," and there was a need for a law to address both crimes "[a]s they start to interconnect."  151 Cong. Rec. H6299 (daily ed. July 21, 2005) (statement of Rep. Souder).  When the proposed legislation was revisited in December 2005, Representative Hyde commented that the bill offered "a new tool to attack the growing phenomenon of narco-terrorism, with the proceeds of illicit drug [trafficking] funding and financing feeding the Foreign Terrorist Organizations . . . and supporting acts of terrorism."  151 Cong. Rec. H11538 (daily ed. Dec. 14, 2005) (statement of Rep. Hyde).  While the purpose of the legislation was to address the fact that global terrorism is funded by drug trafficking, it does not necessarily follow that Congress intended for the proposed legislation to require a direct link

between the specific drug trafficking activity and a specific terrorist activity.  151 Cong. Rec. H6292 (daily ed. July 21, 2005) (statement of Rep. Hyde) (noting that the purpose of the law was to allow the "overworked DEA" to focus its attention on drug traffickers "who are engaging in this deadly trade which supports global terrorism.").  Rather, as written, it is sufficient under the statute that the narcotics proceeds (or anything else of pecuniary value obtained through drug trafficking), is knowingly and intentionally provided to a person or organization that engages or has engaged in terrorism or terrorist activities.  Thus, there is a "nexus" between the drug trafficking and terrorism, and there is no evidence that the plain language of the statute is "at odds with the intentions of its drafters." *Nat'l Pub. Radio, Inc.*, 254 F.3d at 230.

b.       **Congress Acted Within Its Authority to Enact 21 U.S.C. § 960a**

The defendants argue that Congress lacked authority to enact the statute because it is an unconstitutional application of extraterritorial jurisdiction, and therefore Section 960a is unconstitutional.  Contrary to the defendants' contention, Congress acted withing its authority in establishing this extraterritorial offense.

Federal statutes are presumed constitutional.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000).  Accordingly, a congressional enactment will only be invalidated on a "plain showing" that Congress exceeded its authority under the U.S. Constitution.  *Id*.  Pursuant to Article I of the U.S. Constitution, Congress has the authority to enact laws applicable to conduct beyond the territorial boundaries of the United States.  *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 258-59 (1991).  As discussed in more detail below, Congress has constitutional authority to enact Section 960a pursuant to: (1) the Offenses Clause; (2) the Necessary and Proper Clause; (3) the Foreign and Interstate Commerce Clause; and (4) Congress's inherent

powers of external sovereignty.

      i.       The Offenses Clause

The Constitution gives Congress authority "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. The defendants claim that the Offenses Clause does not provide Congressional authority to enact Section 960a because narco-terrorism is not sufficiently recognized or clearly defined to be against the Law of Nations. Defs. P. &. A. at 16-18. The defendants fail to recognize, however, that the Offenses Clause "does not merely give Congress the authority to punish offenses against the law of nations; it also gives Congress the power to 'define' such offenses." *United States v. Laden*, 92 F. Supp. 2d 189, 220 (S.D.N.Y. 2000). Accordingly, so long as the criminal acts in question "are recognized by at least some members of the international community as being offenses against the law of nations, Congress arguably has the power to enact criminal statutes prohibiting such acts pursuant to its power to define offenses against the law of nations." *Id.*, *citing United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820) ("Offenses . . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations. . . . [T]herefore . . ., there is a peculiar fitness in giving the power to define as well as to punish."); *see United States v. Arjona*, 120 U.S. 479, 483-88 (1887) ("if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offense against the law of nations"); Lichter, *supra* at 1955-56.

Because there is a broad international consensus that drug trafficking and the support of terrorism must be curtailed, and both these offenses relate to our Nation's foreign affairs, Section

960a is authorized by the Offenses Clause.  *See* Lichter, *supra* at 1953-56 (concluding that the

Offenses Clause provides Congress with the authority to enact Section 960a because "[a] strong

multilateral consensus condemns terrorist financing, transnational terrorism, and international

narcotics trafficking," and "each offense relates to U.S. foreign affairs.")*.*  Indeed, in

*Humanitarian Law Project*, albeit in the context of 18 U.S.C. § 2339B, the Supreme Court

recognized the importance of Congress's ability to assist its allies with the fight against

terrorism:

> Providing foreign terrorist groups with material support in any form also furthers
> terrorism by straining the United States' relationships with its allies and undermining
> cooperative efforts between nations to prevent terrorist attacks. We see no reason to
> question Congress's finding that international cooperation is required for an effective
> response to terrorism, as demonstrated by the numerous multilateral conventions in force
> providing universal prosecutive jurisdiction over persons involved in a variety of terrorist
> acts, including hostage taking, murder of an internationally protected person, and aircraft
> piracy and sabotage. The material-support statute furthers this international effort by
> prohibiting aid for foreign terrorist groups that harm the United States' partners abroad: A
> number of designated foreign terrorist organizations have attacked moderate governments
> with which the United States has vigorously endeavored to maintain close and friendly
> relations, and those attacks threaten the social, economic and political stability of such
> governments. Other foreign terrorist organizations attack our NATO allies, thereby
> implicating important and sensitive multilateral security arrangements.

*Humanitarian Law Project*, __ U.S. at ___, 130 S. Ct. at 2726 (internal citations and quotations

omitted).

Thus, it is clear that both drug trafficking and terrorism are offenses that fall within the

purview of the Offenses Clause, and therefore it logically follows that Congress has the authority

to legislate narco-terrorism under the Offenses Clause as well.  *See Estupinan*, 453 F.3d at 1338-

39 (Congress' authority to enact the MDLEA is derived from the Offenses Clause); *United States*

*v. Ledesma-Cuesta*, 347 F.3d 527, 531-32 (3d Cir .2003) (same); *United States v.*

*Moreno-Morillo*, 334 F.3d 819, 824-25 (9th Cir. 2003) (same); *Perez-Oviedo*, 281 F.3d at 403

(drug trafficking on the high seas is "condemned universally by law-abiding nations"); *Cardales*,

168 F.3d at 553 ("trafficking in controlled substances aboard vessels is a serious international

problem and is universally condemned") (internal citation and quotation omitted); *Martinez-*

*Hidlado*, 993 F.2d at 1056 ("the trafficking of narcotics is condemned universally by law-abiding

nations."); *Al Kassar*, 582 F. Supp. 2d at 495 (finding that the provision of material support to

FTOs "unquestionably violates the laws of all civilized nations, which uniformly punish,

prosecute and condemn terrorist violence."); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429,

444-46 (E.D.N.Y. 2008) (noting that "the United States has consistently demonstrated its

commitment to combating terrorist financing and to enlisting the help of foreign nations.  In

furtherance of that goal, the United States and other nations . . . have committed to international

cooperation.").

      ii.      The Necessary and Proper Clause

      Congress has the authority to make any laws necessary and proper for the execution of all

of its powers.  U.S. Const. art. I, § 8, cl. 18.  "[I]f [a] treaty is valid there can be no dispute about

the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to

execute the powers of the Government."  *United States v. Belfast*, ___F.3d ___, 2010 WL

2787629 at *14 (11th Cir. July 15, 2010), *quoting Missouri v. Holland*, 252 U.S. 416, 432

(1920); *see also United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1988) ("If the Hostage Taking

Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that

the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause.").

Despite the defendants' assertion to the contrary, *see* Defs. P. & A. at 18, the United States is a

party to several treaties supporting the prohibition of both terrorism and narcotics trafficking, and therefore Congress has the authority to enact Section 960a as a necessary measure to enforce those treaties.  *See, e.g.,* International Convention for the Suppression of the Financing of Terrorism, *entered into force* Apr. 10, 2002, 2178 U.N.T.S. 197; International Convention for the Suppression of Terrorist Bombings, *concluded on* Dec. 15, 1997, 2149 U.N.T.S. 256; United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, *concluded on* Dec. 20, 1988, 1582 U.N.T.S. 95; Single Convention on Narcotic Drugs, *concluded on* Mar. 30, 1961, 520 U.N.T.S. 151.  Significantly, as parties to these treaties, the United States is <u>required</u> to criminalize the offenses prohibited in the treaties.  For example, Article 4 of the International Convention for the Suppression of the Financing of Terrorism provides: " Each State Party shall adopt such measures as may be necessary . . . [t]o establish as criminal offences under its domestic law the offences set forth in article," referring to the financing of terrorism and terrorist activity.  *See* International Convention for the Suppression of the Financing of Terrorism, *signed by the U.S.*, Jan. 10, 2000, 2178 U.N.T.S. 197.  Similarly, Article 3 of the 1988 Vienna Convention requires its Parties to "adopt such measures as may be necessary . . . [t]o establish as criminal offences under its domestic law," against, *inter alia*, the intentional production, manufacture, distribution or possession of any narcotic drug, as well as the financing of such offenses.  *See* 1988 Vienna Convention, *signed by the United States,* Dec. 20, 1988, 1582 U.N.T.S. 95.

     iii.     The Foreign and Interstate Commerce Clause

     Congress has the power to regulate foreign and interstate commerce.  *See* U.S. Const. art. I, § 8, cl. 3.  It is uncontroverted that the drug trade affects interstate and foreign commerce, and

Congress has authority to enact drug trafficking laws under the Commerce Clause.  *See Gonzales v. Raich*, 545 U.S. 1, 10-15 (2005) (finding that the regulation of the importation, manufacture and distribution of drugs clearly falls within Congress's authority under the Commerce Clause); *United States v. Hawkins*, 104 F.3d 437, 440 (D.C. Cir. 1997) (Congress has the authority to regulate all of the commerce in controlled substances); *United States v. Jackson*, 111 F.3d 101, 102  (11th Cir. 1997) ("The illegal possession and sale of drugs affects interstate commerce, and Congress accordingly has authority under the Commerce Clause to criminalize and punish drug-related activity."); *United States v. Staples*, 85 F.3d 461, 463 (9th Cir. 1996) (drug trafficking is a commercial activity which substantially affects interstate commerce); *United States v. Thornton*, 901 F.2d 738, 741 (9th Cir. 1990) ( "Congress has stated and we have confirmed that drug trafficking is a national concern which affects interstate commerce.").

Recently, the Supreme Court observed that "[e]veryone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."  *Humanitarian Law Project*, ____U.S. at ____, 130 S. Ct. at 2724.  Indeed, it is well-established that "[t]he United States has a clear interest in combating terrorism both within its borders and abroad," *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 108 (E.D.N.Y. Mar. 5, 2010), *citing Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006), and there is an "overriding national interest in eliminating financial support of terrorism," and that "the national concern with global terrorism and its sources of financing [has] persisted" over the past two decades.  *Strauss*, 249 F.R.D. at 444-46.  Thus, it logically follows that, if Congress has authority under the Commerce Clause to criminalize drug trafficking, Congress has the authority under the Commerce Clause to criminalize drug trafficking and the use of its proceeds to support terrorism and terrorist

activities.

Moreover, the defendants' contention that the Foreign Commerce Clause does not apply because the statute does not require either "the narcotics trafficking component or the terrorism component" to have any economic impact on the United States is without merit.  *See* Defs. P. & A. at 18.  There is no requirement that a defendant's particular crime have a substantial effect on interstate or foreign commerce, as long as the aggregate class of activity that Congress seeks to regulate substantially affects commerce.  *See Raich*, 545 U.S. at 17.  In any event, Congress has a rational basis for concluding that drug trafficking and the use of its proceeds to support terrorism or terrorist activity has a substantial affect on interstate and foreign commerce.  *See, e.g., United States v. Celis*, 608 F.3d 818, 825 (D. C. Cir. June 18, 2010) (per curiam) (noting that the FARC is the most significant drug trafficking organization in Colombia); *United States v. Martinez*, 476 F.3d 961, (D.C. Cir. 2007) (nexus between international drug trafficking and the United States established by, *inter alia*, expert testimony that Colombian cocaine transported through Central America "is almost always headed" to the United States); *Pineda*, Cr. No. 04-232, 2006 WL 825778, at *1 (observing that the FARC targets and commits terrorist activities against Americans); Thomas, *supra* at 1889 (FARC described as "strongly Anti-American, characterizing American citizens as military targets, and has engaged in violent acts against Americans in Colombia.").

iv.    Congress's inherent powers of external sovereignty

Congress has broad authority to enact extraterritorial legislation because the capacity to encroach upon governmental powers reserved to the states is limited, and the United States has the inherent sovereign power to legislate extraterritorially.  *See United States v. Curtiss-Wright*

*Export Corp.*, 299 U.S. 304, 315-18 (1936).  Indeed, "[t]he Supreme Court has recognized that,

with regard to foreign affairs legislation, 'investment of the federal Government with the powers

of external sovereignty did not depend upon the affirmative grants of the Constitution.'" *Laden*,

92 F. Supp. 2d. at 221, *quoting Curtiss-Wright Export Corp.*, 299 U.S. at 318.  As observed in

*Curtiss-Wright Export Corp.*, Congress's authority to regulate foreign affairs "exist[s] as

inherently inseparable from the conception of nationality." *Id*. (citations omitted).  More

specifically, Congress's inherent authority to act beyond its territorial borders stems from the

need to protect the nation "from destruction." *Id*. (citations omitted).  As discussed above, the

United States has a vital interest in combating global terrorism, which is funded by drug

trafficking (which in and of itself threatens the nation's security), and in protecting its citizens

and assisting its allies in the war against terror. *See Humanitarian Law Project*, ____U.S. at

____, 130 S. Ct. at 2724, 2726; *Cardales*, 168 F.3d at 553; *Suerte*, 291 F.3d at 377; *Martinez-*
*Hidlado*, 993 F.2d at 1056; *Goldberg*, 690 F. Supp. 2d at 108; *Al Kassar*, 582 F. Supp. 2d at 495;

*Strauss*, 249 F.R.D. at 444-46.

Thus, because Congress had authority under four separate powers to enact Section 960a,

defendants' argument that the statute is unconstitutional is without merit and is not grounds for

dismissal of the indictment.

**WHEREFORE**, for the aforementioned reasons, the Government respectfully submits

that Defendants' Motion to Dismiss Indictment should be **DENIED**.


Respectfully submitted,

Arthur G. Wyatt, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C.


By:     _____/s/_____

Mary E. Toscano
Glenn C. Alexander
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
(202) 305-2795
Mary.Toscano@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that, on this 6th day of August, 2010, a copy of the foregoing Response to

Defendants' Motion to Dismiss Indictment was filed electronically with the Clerk of the Court

and served on all counsel of record through the electronic case filing system.


_____/s_____

Mary E. Toscano
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Ave N.W., 8th floor
Washington, DC 20530
(202) 305-2795